**Roselle M. NEELY, Plaintiff,**

v.

**BAR HARBOR BANKSHARES, et al., Defendants.**

No. 02–CV–98–B–S.

United States District Court, D. Maine.

June 9, 2003.

Ralph A. Dyer, Law Offices of Ralph A. Dyer, Portland, ME, for Plaintiff.

James T. Kilbreth, Verrill & Dana, Portland, ME, William B. Devoe, Eaton, Peabody, Bradford & Veague, Bangor, ME, Graydon Stevens, Kelly, Remmel & Zimmerman, Lee H. Bals, Marcus, Clegg & Mistretta, P.A., Portland, ME, for Defendants.

### ORDER

SINGAL, Chief Judge.

The co-trustee of an irrevocable trust brings a complaint against various financial institutions and their officers alleging violations of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5, the Investment Advisers Act of 1940, and the laws of the state of Maine. Presently before the Court are three motions: 1) Defendants' Motion for Summary Judgment (Docket # 38) filed by Bar Harbor Bankshares, Bar Harbor Banking & Trust Company, BTI Financial Group, Bar Harbor Trust Services, Block Capital Management, Dirigo Investments, Inc., Brett S. Miller and Frank Jansen (collectively "Defendants"); 2) Plaintiff's Motion to Strike Defendants' Statement of Uncontroverted Material Facts (Docket # 49); and 3) Defendants' Motion to Exceed the Page Limit (Docket # 55). For the reasons discussed below the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment, DENIES Plaintiff's Motion to Strike, and GRANTS Defendants' Motion to Exceed the Page Limit.

## I. STANDARD OF REVIEW

The Court grants a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine for these purposes if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that has "the potential to affect the outcome of the suit under the applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993). The Court views the record in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *McCarthy v. Northwest Airlines*, 56 F.3d 313, 315 (1st Cir.1995).

## II. BACKGROUND

Plaintiff Roselle Neely ("Mrs.Neely") created a trust ("Trust" or "Neely Trust") by an Irrevocable Trust Agreement dated May 1, 1972. The Trust provided that Mrs. Neely would receive all income arising from the Trust during her lifetime, and that all the assets remaining in the Trust after her death would be distributed to her lineal descendants as remainder beneficiaries of the Trust. In addition, the Trust allowed for principal distributions in the event of illness or emergency and for educational requirements.

In December 1983, the Penobscot County Probate Court ("Probate Court") appointed Bar Harbor Barking & Trust Company ("BHBT") and Mrs. Neely as co-trustees of the Trust. From December 1983 to approximately June 1999, BHBT assigned Dwight Eaton ("Eaton") to perform its duties as co-trustee of the Trust. During this time, Mrs. Neely and her husband, James Neely(collectively "the Neelys")[1] stated that their objectives were to "generate some cash flow, to provide growth at a reasonable risk level, to avoid additional taxes, and to reduce the potential for catastrophic loss." (*See* James Neely Dep. at 12 (Docket # 38).) Eaton and Mrs. Neely enjoyed a comfortable working relationship. Eaton, however, retired in June 1999.

In June 1999, the Neelys met with Paul Ahern ("Ahern"), Eaton's successor responsible for managing the Trust. During the meeting, Mrs. Neely provided Ahern with specific directions for the investment of the Trust. At the time, the percentage of stock in the portfolio had grown substantially as a result of the market's climb. Accordingly, Mrs. Neely requested that BHBT reduce the equity allocation of the Trust from eighty-three percent to seventy percent. In addition, Mrs. Neely requested distributions from the Trust of $15,000 per year. In order to make these distributions, the parties agreed that the Trust would be managed to produce an income of approximately $12,000 per year and that annual principal distributions of $3000 would be made for a period of time to repay Plaintiff for past tuition and health expenditures totaling $63,000. Finally, Mrs. Neely requested that Ahern invest in technology stocks.

In early 2000, Bar Harbor Bankshares ("Bankshares"), BHBT's parent company, re-organized BHBT's trust and financial

---

1. For purposes of this discussion, the Court treats Mr. Neely as Mrs. Neely's agent because, based on the record, Mr. Neely acted on Mrs. Neely's behalf with her proper authorization. Accordingly, the Court attributes Mr. Neely's actions to Mrs. Neely. *See Lunge v. Abbott*, 114 Me. 177, 95 A. 942 (1915).

services business. Pursuant to the reorganization, Bankshares formed BTI Financial Group ("BTI") as a subsidiary. BTI then further formed three of its own subsidiaries, Bar Harbor Trust Services ("BHTS"), Block Capital Management ("Block"), and Dirigo Investments, Inc. ("Dirigo"). BHTS acquired BHBT's trust and financial services business, thereby assuming BHBT's fiduciary capacities and obligations. In addition, Block became the registered investment adviser, and Dirigo became the broker-dealer for all trades initiated by Block.[2]

Subsequent to the restructuring, Block established a growth-oriented model to invest the equity portfolios of various trusts. Approximately twenty of the larger trust accounts under BHTS's management were placed "on the model." (*See* Pl.'s Resp. to Defs.' Statement of Material Facts (PRDSMF) at ¶ 11.4.10 (Docket # 47).) Approximately forty more trust accounts were added in subsequent months. The Neely Trust was among the sixty accounts put on the model. The trusts were collectively and actively traded in block transactions on a weekly basis, barring some unique constraints in an individual portfolio. Upon being placed on the model, the Neely Trust was invested in a growth intensive strategy. In 2000, the Trust had a turnover rate of sixty-two percent.[3] In 2001, the Trust had a turnover rate of sixty-four percent.

When the Trust started declining in value beginning in 2000, and continuing into 2001, the Neelys began raising a number of questions as to the Trust's management. In October 2001, after learning that the Trust had been invested on the growth intensive model, Mrs. Neely requested that BHTS stop trading on her account. In early 2002, Mrs. Neely filed suit in Probate Court seeking to replace BHTS as co-trustee. The Probate Court approved the substitution of Maine Bank & Trust Company for BHTS as co-trustee.

Mrs. Neely now brings this action alleging various violations under federal and state law. Specifically, Mrs. Neely alleges violations under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (2003) (Counts I and II); sections 206 and 215 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6, 80b–15 (Count III); and Maine law, including securities fraud (Count IV), breach of contract (Count V), interference with contract (Count VI), conversion (Count VII), common law fraud and deceit (Count VIII), breach of fiduciary duty (Count IX), aiding and abetting the breach of fiduciary duty (Count X), and negligent supervision (Count XI). In response, Bankshares, BHBT, BTI, BHTS, Block, Dirigo, Brett Miller and Frank Jansen have brought a motion for summary judgment to dismiss all claims. The Court discusses whether Defendants are entitled to summary judgment before moving on to consider the other motions presently before the Court.

---

**2.** In addition, among the individual Defendants are: 1) Paul Ahern ("Ahern"), the former director of Bankshares, who was also the President and Director of BTI and Block and a member of Block's investment committee; 2) Brett Miller, the President and Chief Investment Officer of Block and a member of Block's investment committee; and 3) Frank Jansen, the person responsible for the "day-to-day" operation of BHTS. (*See* Compl. at ¶ 13 (Docket # 1).)

**3.** "Turnover is calculated by the SEC formula in this case, which uses the lower of annual purchases or sales divided by the average monthly account values for the year." (*See* Brett Miller Dep. at 87 (Docket # 38).) BHTS charged a fee of six cents per share when executing stock trades that were block traded with other client trades.

## III. DISCUSSION

### A. Motion for Summary Judgment

Plaintiff takes issue with Defendants' administration of the Trust. In particular, Plaintiff alleges that Defendants went against her specified investment objectives and, instead, managed the Trust for their own benefit by restructuring the Trust portfolio toward more growth. Defendants respond that the restructuring was done at Plaintiff's request. The issue, therefore, is whether Defendants received proper authorization to manage the Trust in the way that they did. This dispute is central to Counts I, II, IV, V, VI, VII, VIII, IX, and X Accordingly, the Court summarizes the facts relevant to this dispute before discussing Counts III and XI.

### 1. Counts I, II, IV, V, VI, VII, VIII, IX, and X

Defendants assert that Plaintiff is a relatively sophisticated investor who urged investment geared towards growth and now complains because her portfolio declined in value. According to Defendants, Plaintiff understood that, in order to make the distributions she requested in June 1999, it would be necessary to allocate a higher percentage of the Trust's assets to the growth portion of the account. In addition, Defendants assert that Plaintiff sought to manage the $63,000 attributed to past tuition and health expenditures as part of the growth portion of the Trust account. Finally, Defendants assert that Plaintiff requested that Ahern invest the Trust assets "more heavily" in high growth technology stocks. (*See* Defendants' Statement of Uncontroverted Material Facts (DSMF) at ¶ 6 (Docket # 39).) Defendants argue that because they acted simply to satisfy Plaintiff's requests, they are entitled to summary judgment.

Plaintiff's version of the facts, however, fundamentally differs from Defendants' version. According to Plaintiff, she requested in June 1999, and re-confirmed in October 1999, that the equity allocation in the Trust would be reduced to fifty-five percent after the initial reduction from eighty-three percent to seventy percent. Plaintiff asserts it was her understanding that by reducing the equity allocation to fifty-five percent and proportionately increasing the fixed-income allocation to forty-five percent, the Trust would generate sufficient net income to fund the $15,000 yearly payout. In addition, Plaintiff states that it was her understanding that, to the extent that such fund distribution could not be made from net income, principal distributions would be made to satisfy the difference. Plaintiff denies that she ever gave Defendants consent to invest the assets of the Trust in anything but conservative investments that would provide long-term benefit to herself and the other beneficiaries. According to Plaintiff, even her request for investment in technology stocks was a request for Ahern to invest in only a "couple" of stocks to better diversify the account because at the time "[the Trust] had nothing in the technology sector." (*See* James Neely Dep. at 54 (Docket # 47).) Further, Plaintiff denies that she is a sophisticated investor. According to Plaintiff, Defendants deliberately disregarded her specific requests and implemented an investment strategy focused on growth as part of a scheme to generate more income for themselves. Plaintiff, therefore, requests that Defendants' motion for summary judgment be denied.

Viewing the facts in the light most favorable to Plaintiff, the Court finds that there are material facts in dispute concerning whether Plaintiff authorized Defendants to use a growth oriented investment strategy in managing the assets of the Trust. This dispute is material to Counts

I, II, IV, V, VI, VII, VIII, IX, and X Accordingly, Defendants are not entitled to summary judgment on these counts. The Court now discusses the remaining counts, Counts III and XI.

### 2. Count III

■ In Count III of her Complaint, Plaintiff requests rescission of the contract between Block and BHTS and restitution of all fees paid by the Trust for investment advisory and management services provided by Block. Rescission is a remedy under the Investment Advisers Act to void an investment adviser's contract. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 24, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). The rescinding party may be entitled to restitution of any consideration given under the contract, less any value conferred by the other party. *Id.,* at n. 14, 100 S.Ct. 242. As Defendants correctly state, however, there is no right of action under the Act unless there is first an investment adviser contract between the parties. *See, e.g., Paul S. Mullin & Assocs., Inc. v. Bassett,* 632 F.Supp. 532, 537 (D.Del.1986) ("[O]nly the parties to [an investment adviser] contract can avail themselves of the remedy of rescission."). Here, although BHTS has an investment adviser contract with Block, Plaintiff does not. Plaintiff, therefore, cannot sue Block to recover the management fees paid to it by BHTS. Accordingly, Defendants are entitled to summary judgment as a matter of law on this count.[4]

### 3. Count XI

■ In Count XI of her Complaint, Plaintiff requests damages for Bankshares' negligent supervision of its subsidiaries, BTI, BHTS, Block, and Dirigo. Maine

does not recognize the tort of negligent supervision. *Napieralski v. Unity Church of Greater Portland,* 802 A.2d 391, 392 (Me.2002) ("We have not recognized the tort of negligent supervision in Maine."); *see also Hinkley v. Penobscot Valley Hosp.,* 794 A.2d 643, 647 (Me.2002). Accordingly, Defendants are entitled to summary judgment as a matter of law on this count.

### B. Plaintiff's Motion to Strike and Defendants' Motion to Exceed Page Limit

Plaintiff argues that Defendants' Statement of Material Facts is in blatant disregard of Local Rule 56. In addition, Plaintiff opposes Defendants' Motion to Exceed the Page Limit as violating Local Rule 7. Notwithstanding Plaintiff's argument, the Court has relied only on those assertions that are material and in compliance with Local Rules 7 and 56. Therefore, the Court denies Plaintiff's Motion to Strike and grants Defendants' Motion to Exceed the Page Limit.

## IV. CONCLUSION

For the reasons discussed above, the Court: 1) GRANTS Defendants' Motion for Summary Judgment (Docket # 38) on Counts III and XI but DENIES Defendants' motion on Counts I, II, IV, V, VI, VII, VIII, IX, and X; 2) DENIES Plaintiff's Motion to Strike Defendants' Statement of Uncontroverted Material Facts or Portions Thereof (Docket # 49); and 3) GRANTS Defendants' Motion to Exceed the Page Limit (Docket # 55).

SO ORDERED.

---

4. As part of her opposition to Defendants' Motion to Exceed Page Limit, Plaintiff argues that the Court should disregard Defendants' argument on this issue because it was raised for the first time in reply. Defendants' reply, however, merely addresses issues raised by Plaintiff in her response. Accordingly, the Court rejects Plaintiff's argument.